USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ Nos. 97-1759 97-1780 97-1760 97-1805 97-1761 97-1995 97-1762 97-1996 97-1763 97-1997 97-1773 97-2070 PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, ET AL., Plaintiffs, Appellees, v. DOUGLAS L. PATCH, IN HIS CAPACITY AS A MEMBER OF THE NEW HAMPSHIRE PUBLIC UTILITIES COMMISSION, ET AL., Defendants, Appellees, _______________ CABLETRON SYSTEMS, INC., ET AL., Applicants for Intervention, Appellants. _________________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Ronald R. Lagueux,* U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Tauro,** District Judge. ______________ _________________________ Steven S. Rosenthal, with whom Jeffery A. Tomasevich, _____________________ _______________________ Morrison & Foerster, LLP, F. Anne Ross, F. Anne Ross, P.C., John _________________________ ____________ __________________ ____ J. Ryan, Casassa and Ryan, Michael W. Holmes, James R.M. ________ __________________ ___________________ ___________ Anderson, Peter H. Grills, David E. Crawford, O'Neill, Grills & ________ _______________ __________________ _________________ O'Neill, PLLP and Thomas I. Arnold III were on consolidated _____________ ______________________ brief, for all appellants. Peter H. Grills, with whom David E. Crawford, O'Neill, _________________ ___________________ ________ Grills & O'Neill, PLLP and Thomas I. Arnold III, Assistant City _______________________ _____________________ Solicitor, were on brief, for appellant City of Manchester. Philip T. McLaughlin and Martin P. Honigberg on brief for _____________________ ____________________ the State of New Hampshire, amicus curiae. Evelyn R. Robinson on brief for Ohio Consumers' Counsel and __________________ National Ass'n of State Consumer Advocates, amici curiae. Dennis Lane, with whom Michael E. Tucci and Morrison & ___________ __________________ ___________ Hecker, LLP were on brief, for defendants-appellees. ___________ Allan B. Taylor, with whom John B. Nolan, Gary M. Becker, ________________ _____________ _______________ and Day, Berry & Howard were on brief, for plaintiffs-appellees. ___________________ _________________________ February 3, 1998 _________________________ _______________ *Of the District of Rhode Island, sitting by designation. **Of the District of Massachusetts, sitting by designation. SELYA, Circuit Judge. After the New Hampshire Public SELYA, Circuit Judge. _____________ Utilities Commission (PUC) formulated a plan to inject retail competition into the New Hampshire electric power market, Public Service Company of New Hampshire (PSNH) filed suit against the PUC's members, seeking to block inauguration of the plan. Several parties moved to intervene pursuant to Fed. R. Civ. P. 24. Not all succeeded. Six disappointed would-be intervenors appeal from the denial of intervention.1 Finding no sign that the district court abused its discretion, we affirm. I. BACKGROUND I. BACKGROUND Two recent opinions of the court below thoroughly recount the complicated background of this case. See Public ___ ______ Serv. Co. v. Patch, 173 F.R.D. 17, 22-24 (D.N.H. 1997) (PSNH II); _________ _____ _______ Public Serv. Co. v. Patch, 962 F. Supp. 222, 225-29 (D.N.H. 1997) ________________ _____ (PSNH I). We draw heavily from those sources as we set the stage ______ for consideration of the instant appeals. A. The Night the Lights (Almost) Went Out in New Hampshire. A. The Night the Lights (Almost) Went Out in New Hampshire. _______________________________________________________ PSNH is New Hampshire's largest electric public utility and supplies approximately 70% of the citizenry's power needs. In the early 1970s, management predicted that rising energy demands soon would outstrip PSNH's generating capabilities. To ameliorate this bleak outlook, PSNH undertook to construct a nuclear power plant in Seabrook, New Hampshire. Because state law prevented it from factoring the plant's construction costs  ____________________ 1Three of the would-be intervenors also have attempted to take protective appeals from other orders entered by the district court. We deal with these additional appeals in Part V, infra. _____ 3 into the rate structure until Seabrook became operational, PSNH relied primarily on commercial financing to underwrite the project. Regulatory reform and public opposition hindered Seabrook's progress to the point where the facility became an albatross wrapped snugly around PSNH's corporate neck. Management's forecast that Seabrook would be on line in 1979 proved much too sanguine: construction of the plant's generating unit was not completed until 1986, and even then, commercial operation was infeasible. As delays mounted, so too did PSNH's indebtedness. In 1988, PSNH no longer could service the debt and filed for bankruptcy protection in the United States Bankruptcy Court for the District of New Hampshire. The State of New Hampshire, fearful that its residents might find themselves consigned to an unusually rustic lifestyle, intervened in the insolvency proceedings. The State's participation was essential to resolving the bankruptcy: as a regulated utility, PSNH's value depends on the rates that it can charge for electricity, and the State sets those rates based on its calculation of the investment that PSNH prudently devotes to the provision of electric service (the so-called rate base). In the end, PSNH's creditors and equity holders agreed to place a $2.3 billion value on the utility a value significantly higher than its pre-bankruptcy rate base. Northeast Utilities (NU) then acquired all of PSNH's stock at the capitalized price. As part and parcel of this transaction, the 4 State executed a rate agreement (the Agreement) designed to permit NU to recoup its investment over time. To mitigate the impact of this recoupment on ratepayers while still providing meaningful financial relief to the rehabilitated bankrupt, the Agreement preserved PSNH's status as an integrated electric utility (i.e., one that engages in the generation, transmission, and distribution of electric power) and promised annual 5.5% electric rate increases for the next seven years. The Agreement also made provision for the gradual recovery of PSNH's Seabrook-related costs. It contemplated that NU would take over the operation of Seabrook via a corporate affiliate, North Atlantic Energy Corporation (NAEC), subject to a stipulation, contained in the Agreement, that the State would permit PSNH to buy Seabrook-generated power from NAEC at prices sufficient to recover the portion of the rate base attributable to Seabrook over a reasonable interval. Finally, to ensure the eventual recovery of PSNH's entire capitalized value, the Agreement allowed PSNH to designate some $400 million of the rate base as "regulatory assets." Under this arrangement, these regulatory assets (which in this case consisted mostly of governmentally mandated purchase agreements with small power producers) became eligible for amortization, albeit over a long number of years (thus cushioning the impact on electric rates). The bankruptcy court approved the Agreement, see In re ___ _____ Public Serv. Co., 114 B.R. 820, 843 (Bankr. D.N.H. 1990); the New ________________ Hampshire legislature authorized the PUC to review it, see N.H. ___ 5 Rev. Stat. Ann. 362-C (1995); the PUC furnished its seal of approval, see In re Northeast Utils./Public Serv. Co., 114 ___ ____________________________________________ P.U.R.4th 385 (N.H.P.U.C. 1990); the New Hampshire Supreme Court upheld the PUC's action, see Appeal of Richards, 590 A.2d 586 ___ ___________________ (N.H. 1991); and PSNH emerged from bankruptcy. B. The Concord Tea Party. B. The Concord Tea Party. _____________________ Due in part to the annual rate increases mandated by the Agreement, New Hampshire consumers pay one of the highest average electric rates in the nation. Predictable discontent prompted the state legislature to enact the Electric Utility Restructuring Act, N.H. Rev. Stat. Ann. 374-F:1 to F:6 (Supp. 1997), a statute designed to introduce retail competition into the marketplace as a means of reducing electric rates. The statute directed the PUC to develop and put into effect no later than January 1, 1998, a restructuring plan for New Hampshire's electric utility industry. See id. 374-F:4. ___ ___ The PUC conducted hearings apace and issued its restructuring plan (the Plan) on February 28, 1997. The Plan provides that the PUC will continue to set all distribution access rates. However, electric utilities must unbundle their generation, transmission, and distribution services, as well as open their distribution networks utility poles and wires to all consumers on a nondiscriminatory basis. In theory, unbundling will enable customers to select from a roster of power generators whose rates will reflect market prices. And although federal law requires that transmission tariffs remain the 6 province of the Federal Energy Regulatory Commission (FERC), the Plan seeks to have the PUC exercise a modicum of control in this area as well by directing utilities to obtain PUC approval of proposed tariffs prior to effecting FERC filings. Finally, the Plan imports a market domination deterrent, mandating that each utility choose whether to operate as a power generator or power distributor, and precluding utilities from continuing to act, directly or indirectly, in both capacities. Utilities that select the distribution pathway must divest all power generation assets by December 31, 2000, and likewise must sever contractual and corporate ties with utilities that offer competitive electric service in the same territory. Similar restrictions apply to utilities that select the generation pathway. Two aspects of the PUC's edict are particularly pertinent for purposes of the pending litigation. First, in promulgating the Plan, the PUC declined to treat the Agreement as a contract that constrained its actions. Second, a side effect of the Plan's divestiture requirement is the creation of "stranded costs." This phenomenon will occur because, under the Plan's competitive market paradigm, the costs of certain asset investments owned by an integrated utility will become unrecoverable from ratepayers when the utility elects between the distribution and generation routes. The Plan provides a palliative in the form of interim and long-term stranded cost recovery charges (SCRECHs). The PUC will assess each affected utility's stranded costs and calculate an appropriate SCRECH for 7 inclusion in the rates set for access to the utility's distribution network. SCRECHs ordinarily will be calculated by means of a cost-of-service ratemaking methodology, but if the PUC concludes that a utility's costs and rates exceed a "regional average rate benchmark," then it may deny the utility full recovery of its stranded costs. At present, PSNH's rates exceed the regional average rate benchmark, and the PUC has ruled that PSNH may not recover completely its stranded costs. Thus, PSNH insists that introduction of the benchmark will require it to write off the $400 million in regulatory assets and lead to another bankruptcy.2 C. The Empire Strikes Back. C. The Empire Strikes Back. _______________________ On March 3, 1997, PSNH, NU, and NAEC (collectively "PSNH" or "the plaintiffs") filed suit in New Hampshire's federal district court against the members of the PUC. Their amended complaint limns a litany of federal preemption claims. These include a claim premised on section 201(b) of the Federal Power Act, 16 U.S.C. 824(b) (1994); a claim premised on sections 205 and 206 of the same statute, 16 U.S.C. 824(d), (e); a claim premised on the filed rate doctrine, see, e.g., Boston Edison Co. ___ ____ _________________ v. FERC, 856 F.2d 361, 369 (1st Cir. 1988) (discussing doctrine); ____  ____________________ 2On April 7, 1997, the PUC stayed implementation of portions of the Plan to rehear whether the PSNH will in fact be forced to write off the regulatory assets. The PUC at the same time announced its intention to revisit the question of whether the Plan repudiates an enforceable obligation of the State (i.e., the Agreement). These developments clearly bear upon certain contested issues in the underlying case (e.g., ripeness and abstention), but they do not possess great significance vis- -vis the question of intervention. 8 a claim premised on section 201 of the Public Utility Regulatory Policies Act of 1978, Pub. L. No. 95-617, 92 Stat. 3117 (codified as amended in scattered sections of 15 and 16 U.S.C.); and a claim premised on the Public Utility Holding Companies Act, 15 U.S.C. 79 to 79z-6 (1994). The complaint also includes several constitutional claims, including three separate theories under which the PUC's orders allegedly work an unlawful taking; a Commerce Clause claim to the effect that the PUC is attempting impermissibly to regulate interstate commerce; a Contracts Clause claim to the effect that the Plan unlawfully compromises the Agreement; and a First Amendment claim that defies ready comprehension. Lastly, the complaint contains claims that the Plan transgresses an injunction entered by the bankruptcy court in 1990 and simultaneously violates 42 U.S.C. 1983 (1994).3 The complaint prays, inter alia, for an injunction against _____ ____ implementation of the Plan and a declaration that the Plan is unlawful. On March 10, 1997, the district court entered a temporary restraining order (TRO) that enjoined the defendants from enforcing those sections of the Plan that purported to restrict PSNH's ability to recover fully its stranded costs. Four days later, the court heard argument on a gallimaufry of  ____________________ 3In the introductory portions of their amended complaint, the plaintiffs accuse the PUC of affording them insufficient time to make their case administratively, failing to enforce discovery rules, and holding hearings that were a "mere pretense." These allegations sound like a prelude to a procedural due process challenge, yet the plaintiffs never make such a claim. 9 intervention motions and took them under advisement pending a decision on ripeness and abstention (issues which, if determined adversely to the plaintiffs, would render intervention moot). The court scheduled a hearing on these issues for March 20 and granted the would-be intervenors leave to file amicus curiae briefs. On the appointed date, Judge Lagueux heard arguments and reserved decision. The next day, he amended the TRO to enjoin portions of the Plan that, in the plaintiffs' view, repudiated obligations created by the Agreement. He then continued the TRO "pending further order of the court." In due course, Judge Lagueux ruled that the case not only was ripe, but also an inappropriate candidate for abstention. See PSNH I, 962 F. Supp. at 229-44. The judge ___ _______ simultaneously signaled his intent to address the motions to intervene without further delay, noted that the TRO would remain in effect pending further order, and directed the clerk of court to schedule a preliminary injunction hearing in June.4 See id. ___ ___ at 244. On June 12, 1997, the district court denied the  ____________________ 4On May 13, the parties to the case (not including the applicants for intervention) agreed to mediation and stipulated to a stay of proceedings, thereby obviating the need for a June preliminary injunction hearing. By its terms, the stay would expire coincident with the end of the mediation period, which was originally contemplated to last through the end of June. As directed by the May 13 stipulation and order, the mediator periodically reported on the parties' progress. Based on these reports Judge Lagueux twice extended the period. On September 3, 1997, the mediator reported that efforts had failed and the stay since has been dissolved. The would-be intervenors did not participate in the mediation process. 10 appellants' motions to intervene. See PSNH II, 173 F.R.D. at 26. ___ _______ The court held in substance that the appellants' interest in securing lower electric rates was too generalized to justify intervention as of right; that the appellants retained the ability to protect their interests in the Plan's implementation regardless of whether they were allowed to participate in the court case; and that, in all events, the presence of the PUC members as defendants ensured adequate representation of the appellants' interests in respect to the issues raised by the complaint. See id. at 26-27. The court did permit three other ___ ___ parties, Granite State Electric Company, Unitil Corporation, and the New Hampshire Electric Cooperative, to intervene on the plaintiffs' side of the case. See id. at 28. One would-be ___ ___ intervenor, the City of Manchester, moved for reconsideration, but to no avail. II. THE CAST OF CHARACTERS II. THE CAST OF CHARACTERS There are six intervention-related appeals before us. In an effort to put matters into more workable perspective, we profile the identity and interests of the six appellants. 1. Cabletron Systems, Inc. (Cabletron) is a New 1. Hampshire corporation with its principal place of business in Rochester, New Hampshire. It is one of the largest private electricity consumers in New Hampshire. 2. The Office of the Consumer Advocate of the State of 2. New Hampshire (OCA) is a state agency statutorily authorized to "petition for, initiate, appear or intervene in any proceeding 11 concerning rates, charges, tariffs, and consumer services before any board, commission, agency, court, or regulatory body in which the interests of residential utility consumers are involved and to represent the interest of such residential utility consumers." N.H. Rev. Stat. Ann. 363.28(II) (1995). 3. The City of Manchester is New Hampshire's largest 3. municipality and serves as the administrator of an electric power aggregation program that procures electricity for some 260 municipal, residential, and commercial accounts. 4. The Campaign for Ratepayers' Rights (CRR) is a non- 4. profit citizens' group composed of several hundred New Hampshire residential and commercial electricity consumers. 5. The Retail Merchants Association of New Hampshire 5. (RMA) is a non-profit corporation based in Concord, New Hampshire. RMA boasts a membership of approximately 700 businesses located in the Concord area. It acts as an electric load aggregator. Under its aegis, members may purchase electricity at discounted rates. 6. Community Action Programs of New Hampshire (CAPS) 6. is an alliance of six non-profit organizations. Its constituent organizations provide assistance programs of various kinds to low-income families in New Hampshire. III. THE LEGAL LANDSCAPE III. THE LEGAL LANDSCAPE The six principal appeals stand or fall on the 12 appellants' entitlement to intervene as of right.5 That entitlement depends, in the first instance, on Fed. R. Civ. P. 24(a), which provides in relevant part: Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties. A party that desires to intervene in a civil action under Rule 24(a)(2) must satisfy four conjunctive prerequisites: (1) a timely application for intervention; (2) a demonstrated interest relating to the property or transaction that forms the basis of the ongoing action; (3) a satisfactory showing that the disposition of the action threatens to create a practical impairment or impediment to its ability to protect that interest; and (4) a satisfactory showing that existing parties inadequately represent its interest. See Conservation Law Found. v. ___ __________________________ Mosbacher, 966 F.2d 39, 41 (1st Cir. 1992). An applicant for _________ intervention as of right must run the table and fulfill all four of these preconditions. The failure to satisfy any one of them dooms intervention. See Travelers Indem. Co. v. Dingwell, 884 ___ ____________________ ________ F.2d 629, 637 (1st Cir. 1989).  ____________________ 5In the court below, the appellants also sought permissive intervention under Fed. R. Civ. P. 24(b). Judge Lagueux rejected those initiatives. See PSNH II, 173 F.R.D. at 29. The ___ ________ appellants have not pressed the point in this venue. 13 The application of this framework to the divers factual circumstances of individual cases requires a holistic, rather than reductionist, approach. See International Paper Co. v. Town ___ _______________________ ____ of Jay, 887 F.2d 338, 344 (1st Cir. 1989). The inherent _______ imprecision of Rule 24(a)(2)'s individual elements dictates that they "be read not discretely, but together," and always in keeping with a commonsense view of the overall litigation. United States v. Hooker Chems. & Plastics Corp., 749 F.2d 968, _____________ _______________________________ 983 (2d Cir. 1984). Because small differences in fact patterns can significantly affect the outcome, the very nature of a Rule 24(a)(2) inquiry limits the utility of comparisons between and among published opinions. See Security Ins. Co. v. Schipporeit, ___ _________________ ____________ Inc., 69 F.3d 1377, 1381 (7th Cir. 1995). ____ The district court's denial of a motion for intervention as of right lays the foundation for an immediate appeal. See Flynn v. Hubbard, 782 F.2d 1084, 1086 (1st Cir. ___ _____ _______ 1986). Although we review the district court's intervention decisions for abuse of discretion, see International Paper, 887 ___ ____________________ F.2d at 344, that discretion is more circumscribed when Rule 24(a) is in play, see Stringfellow v. Concerned Neighbors in ___ ____________ _______________________ Action, 480 U.S. 370, 383 (1987) (noting that the nisi prius ______ court has less discretion in its disposition of motions to intervene as of right). We will reverse the denial of a motion to intervene as of right "if the court fails to apply the general standard provided by the text of Rule 24(a)(2), or if the court reaches a decision that so fails to comport with that standard as 14 to indicate an abuse of discretion." International Paper, 887 ____________________ F.2d at 344. In the case at hand, we can narrow the lens of our inquiry somewhat. For one thing, none of the appellants have argued that the district court misapprehended Rule 24(a)(2)'s analytic framework or failed to appreciate the rule's general standard. For another thing, the appellees concede the timeliness of the intervention motions. Thus, our analysis focuses exclusively on whether the court properly applied the other three elements of the test: sufficiency of interest; likelihood of impairment; and adequacy of representation.6 IV. ANALYSIS IV. ANALYSIS We first address the common arguments for intervention pressed by Cabletron, CRR, RMA, and CAPS (collectively, "the Grouped Appellants"). We then turn to the differentiated rationales for intervention offered by OCA and the City of Manchester. A. The Grouped Appellants. A. The Grouped Appellants. ______________________  ____________________ 6The plaintiffs argue that we should affirm the district court's denial of the motions to intervene filed by Cabletron, RMA, CAPS, and OCA because each of those appellants failed to accompany its motion with "a pleading setting forth the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). We agree that these parties were derelict in their Rule 24(c) duties, and that such dereliction ordinarily would warrant dismissal of their motions. See Rhode Island Fed'n of Teachers ___ _______________________________ v. Norberg, 630 F.2d 850, 854-55 (1st Cir. 1980). In this _______ instance, however, the district court elected to forgive this oversight. See PSNH II, 173 F.R.D. at 24 n.2. Because we affirm ___ _______ the lower court's denial of the motions to intervene on more substantive grounds, we see no reason to revisit that determination. 15 Although there are modest differences in the particulars of their respective situations, a common theme pervades the arguments of all the Grouped Appellants: each strives to justify intervention as a matter of right by reference to the same two interests. First, they assert that the plaintiffs' action asks the district court to strike down the Plan, and that such relief, if granted, would sunder their shared interest in obtaining lower electric rates. Second, they assert that their prior (and anticipated) participation in the PUC's administrative proceedings itself furnishes an independent basis for intervention. We find both assertions wanting. To begin with, the assertion of an economic interest is procedurally vulnerable. Although the Grouped Appellants vigorously pressed this line of argument in the district court, they devote only cursory attention to it on appeal. Consequently, it is not preserved for appellate review. See Ryan ___ ____ v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990). ______________ Even were the asseveration preserved, it would be unavailing. While the type of interest sufficient to sustain intervention as of right is not amenable to precise and authoritative definition, a putative intervenor must show at a bare minimum that it has "a significantly protectable interest," Donaldson v. United States, 400 U.S. 517, 531 (1971), that is _________ _____________ "direct, not contingent," Travelers Indem., 884 F.2d at 638. ________________ Though these contours are relatively broad, the Grouped Appellants' interest in the lower electric rates expected to 16 result from restructuring falls well outside the pale. Potential economic harm to a would-be intervenor is a factor that warrants serious consideration in the interest inquiry. See Conservation Law Found., 966 F.2d at 43; but cf. ___ _______________________ ___ ___ New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co., 732 _____________________________ _________________________ F.2d 452, 466 (5th Cir. 1984) (en banc) (holding that an economic interest alone is insufficient predicate for a Rule 24(a)(2) intervention). It is settled beyond peradventure, however, that an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right. See New Orleans Pub. Serv., 732 F.2d ___ ______________________ at 466; Athens Lumber Co. v. Federal Election Comm'n, 690 F.2d _________________ _______________________ 1364, 1366 (11th Cir. 1982); United States v. American Tel. & _____________ ________________ Tel. Co., 642 F.2d 1285, 1292 (D.C. Cir. 1980). That principle ________ is dispositive here for the Grouped Appellants' theory of economic interest operates at too high a level of generality. After all, every electricity consumer in New Hampshire and every person who does business with any electricity consumer yearns for lower electric rates. To cinch matters, the Grouped Appellants' interest in obtaining lower electric rates also has an overly contingent quality. This is not a case in which ongoing litigation directly threatens an economic right or benefit presently enjoyed by any would-be intervenor. See, e.g., City of Stillwell v. Ozarks ___ ____ __________________ ______ Rural Elec. Coop., 79 F.3d 1038, 1042 (10th Cir. 1996). It is, __________________ rather, a case in which these would-be intervenors root their 17 professed economic interest in an as yet unrealized expectancy of lower electric rates. As the district court perspicaciously observed, numerous market variables will impact New Hampshire electric rates even after the PUC implements a restructuring plan. See PSNH II, 173 F.R.D. at 26. Whether the interaction of ___ _______ these variables actually will produce lower rates is anybody's guess, thus demonstrating the fatally contingent nature of the asserted economic interest. See Travelers Indem., 884 F.2d at ___ ________________ 638-39. The Grouped Appellants also claim a protectable interest within the purview of Rule 24(a)(2) arising out of their prior participation, and their anticipated opportunity for future participation, in the PUC's administrative proceedings. All profess to fear that the plaintiffs' suit will lay waste to the efforts that they expended (culminating in the Plan), and that this threat entitles them to intervention. We do not dismiss this claim lightly. In certain circumstances, an administrative-proceeding interest may well form a sufficient predicate for intervention as of right. Since this clearly is not true across the board, we must evaluate the asserted administrative-proceeding interest in light of the specific claims embodied in the lawsuit pending before the district court and we must do so in keeping with the pragmatic cast of Rule 24(a)(2). Furthermore, we must conduct this assessment with an awareness that Rule 24(a)(2)'s third tine  whether disposition of the extant action may as a practical 18 matter impair or impede the applicant's ability to protect a cognizable interest often influences resolution of the interest question. See Conservation Law Found., 966 F.2d at 42. ___ _______________________ The plaintiffs' complaint does not frontally attack the process through which the PUC arrived at the Plan,7 but, rather, pleads causes of action that will require the district court to measure the submitted Plan against federal statutory and constitutional benchmarks. Hence, adjudication of the plaintiffs' claims will not place the district court in the position of having to rebalance competing policy views anent electric utility industry restructuring or otherwise to co-opt the administrativeproceedingsinwhichthewould-beintervenorsappeared. The Grouped Appellants resist this conclusion. In their estimation, the plaintiffs' challenges do not involve "pristine" questions of federal law, and they express concern that the district court will be forced to immerse itself in the "nitty gritty" of ratemaking. We agree that the district court will have to understand the Plan in order to resolve the plaintiffs' challenges, but we are confident that the PUC is fully capable of explicating the interstices of the Plan to facilitate this review. More to the point, we deem it of decretory significance that the types of viewpoint-balancing issues that merited the inclusion of a wide array of parties in  ____________________ 7Although paragraph 42 of PSNH's amended complaint attributes arbitrary and capricious procedural maneuvers to the PUC, the plaintiffs have not based any of their federal claims on these ostensible procedural defects. 19 the administrative proceedings are not present in this civil action, and we therefore are hard-pressed to see how the present litigation will impair or impede the would-be intervenors' legitimate interests. The Grouped Appellants' reliance on United States v. ______________ South Fla. Water Mgmt. Dist., 922 F.2d 704 (11th Cir. 1991), for ____________________________ the proposition that participation in the PUC's administrative proceedings ipso facto justifies intervention as of right, is ____ _____ misplaced. There, the federal government brought suit alleging that a water management district's irrigation and flood control policies violated a state environmental statute. See id. at 707. ___ ___ The United States asked the district court, inter alia, to set a _____ ____ maximum allowable concentration of nitrogen and phosphorous in farm water runoff. See id. The court denied various farm ___ ___ groups' motions for intervention as of right. The Eleventh Circuit reversed. It found that the Florida statute granted the farm groups a statutory right to participate in the water district's administrative implementation of runoff standards. Because the federal litigation essentially bypassed the administrative framework, denial of intervention would eliminate the farm groups' role in the decisionmaking process. See id. at ___ ___ 708. Such is not the case here. The would-be intervenors heretofore have taken full advantage of their right to participate in the PUC's proceedings, and their role in any future administrative decisionmaking process is not in jeopardy. 20 On the one hand, if the plaintiffs lose, then the Plan that emerged from the administrative proceedings probably will remain intact unless the PUC, in the course of further administrative proceedings (in which the applicants for intervention will have an opportunity to participate), modifies it. On the other hand, if the plaintiffs prevail, then the Plan likely will fall yet the district court will not replace it with another of its own creation. Rather, the PUC will be left to devise a successor plan, and the Grouped Appellants will be able to participate fully in any such efforts. In either event, the would-be intervenors' administrative-proceeding interest remains unsullied.8 The Grouped Appellants also advance the closely related claim that the TRO issued by the district court impairs their right to participate in ongoing or future administrative proceedings before the PUC. This claim requires scant comment. It suffices to say that the present litigation has not impeded this entitlement in any real sense. To the extent that the lower court has halted administrative proceedings, its orders are of universal application: it did not bar the Grouped Appellants selectively from participating in any ongoing proceeding.  ____________________ 8The Grouped Appellants also cite In re Sierra Club, 945 __________________ F.2d 776, 779 (4th Cir. 1991) (dictum), in support of their contention that participation in an administrative proceeding creates an interest that is per se sufficient to warrant intervention as of right in any litigation related to the result of those proceedings. To the extent that the court's broad language can be read as stating such a rule, we respectfully decline to follow it. 21 Indeed, the PUC itself has suspended reconsideration of the Plan pending resolution of this case. While the Grouped Appellants undoubtedly would prefer that the Plan's implementation proceed immediately, the current stalemate does not prejudice their ability to participate prospectively in resumed administrative proceedings once the litigatory logjam clears. Any residual doubt that might linger regarding the Grouped Appellants' right to intervene is assuaged at the final step of the Rule 24(a)(2) inquiry. We agree with the district court that the Grouped Appellants simply have not shown that the defendant commissioners inadequately represent their interests in upholding the Plan. To be sure, an applicant for intervention need only make a minimal showing that the representation afforded by existing parties likely will prove inadequate. See Trbovich v. ___ ________ United Mine Workers, 404 U.S. 528, 538 n.10 (1972). Nonetheless, ___________________ the adequacy of interest requirement is more than a paper tiger. A party that seeks to intervene as of right must produce some tangible basis to support a claim of purported inadequacy. See ___ Moosehead Sanitary Dist. v. S. G. Phillips Corp., 610 F.2d 49, 54 ________________________ ____________________ (1st Cir. 1979). Moreover, the burden of persuasion is ratcheted upward in this case because the commissioners are defending the Plan in their capacity as members of a representative governmental body. Given this fact, the Grouped Appellants must rebut a presumption that the commissioners adequately represent their interests. See Mausolf v. Babbitt, 85 F.3d 1295, 1303 (8th ___ _______ _______ 22 Cir. 1996). This rebuttal requires "a strong affirmative showing" that the agency (or its members) is not fairly representing the applicants' interests. Hooker Chems. & __________________ Plastics, 749 F.2d at 985. ________ The Grouped Appellants attempt to roll this presumption on its side. They maintain that the PUC's status as the principal protector of the general public interest precludes its effective representation of their particularized interests. See, ___ e.g., Mille Lacs Band of Chippewa Indians v. Minnesota, 989 F.2d ____ ____________________________________ _________ 994, 1001 (8th Cir. 1993) (finding the presumption of adequate representation overcome where a suit against the state to enforce an Indian treaty implicated the intervenors' interest in preserving fish and game stock on their private lands). On the facts of the case at bar, however, this resupinate reasoning does not withstand scrutiny: in respect to the plaintiffs' claims, the PUC's interests are perfectly aligned with those of the Grouped Appellants. We explain briefly. Although the motives that drive any individual appellant's support for the Plan may diverge slightly from those of its fellow appellants and also from those of the PUC, all march in legal lockstep when defending the Plan against the plaintiffs' federal statutory and constitutional challenges. None of the Grouped Appellants has propounded any legal argument that the PUC members are unable or unwilling to make, or that subverts the PUC's institutional goals. This symmetry of interest among the Grouped Appellants and the PUC commissioners 23 ensures adequate representation. See American Lung Ass'n v. ___ ____________________ Reilly, 962 F.2d 258, 261-62 (2d Cir. 1992); Washington Elec. ______ _________________ Coop. v. Massachusetts Mun. Wholesale Elec. Co., 922 F.2d 92, 98 _____ _______________________________________ (2d Cir. 1990); see generally United Nuclear Corp. v. Cannon, 696 ___ _________ ____________________ ______ F.2d 141, 144 (1st Cir. 1982) (discussing the factors that a federal court must consider in the adequacy of interest inquiry). If that were not enough and we firmly believe that it is we note that the PUC members have launched a full-scale, uncompromising defense of their Plan. We think the likelihood that the PUC will capitulate cravenly to the plaintiffs' onslaught is extremely remote. This circumstance, in itself, weighs heavily in favor of denying mandatory intervention. See ___ Washington Elec. Coop., 922 F.2d at 98; Natural Resources Defense ______________________ _________________________ Council, Inc. v. New York State Dep't of Envtl. Conservation, 834 _____________ ___________________________________________ F.2d 60, 62 (2d Cir. 1987); cf. Conservation Law Found., 966 F.2d ___ _______________________ at 44 (finding that the Secretary of Commerce inadequately represented the more parochial interests of putative intervenors because he agreed, with minimal opposition, to a consent decree drafted by the plaintiffs). Finally, the Grouped Appellants maintain that the courts must accept at face value the PUC's declaration of its inability to represent their interests, no questions asked. This is sheer persiflage. Here, as in many other contexts, actions speak louder than words. In all events, neither the PUC commissioners' support of and consent to the Grouped Appellants' desire to intervene, nor the commissioners' insinuations that 24 they, alone, are not up to the task of defending the Plan, can strip a federal court of the right and power indeed, the duty  to make an independent determination as to whether Rule 24(a)(2)'s prerequisites are met. See International Paper, 887 ___ ____________________ F.2d at 340-41; Wade v. Goldschmidt, 673 F.2d 182, 184 n.3 (7th ____ ___________ Cir. 1982). B. OCA. B. OCA. ___ We turn next to OCA's quest for intervention. For the most part, its arguments parallel those championed by the Grouped Appellants the six would-be intervenors did, after all, elect to file a consolidated brief and we reject them for the reasons already stated. We write separately, however, to address one idiosyncratic feature. OCA and two amici, the Ohio Consumers' Counsel and the National Association of State Utility Consumer Advocates, contend that the district court should have allowed OCA to intervene as of right because a New Hampshire statute endows it with the authority to represent residential utility consumers "in any proceeding concerning rates, charges, tariffs, and consumer services before any board, commission, agency, court, or regulatory body." N.H. Rev. Stat. Ann. 363:28(II). This legislative directive requiring OCA to devote its representational zeal entirely to the cause of the consumer contrasts with the PUC's statutory mandate to "be the arbiter between the interests of the customer and the interests of regulated utilities." Id. 363:17a. Focusing singlemindedly on ___ 25 these disparate statutory missions, OCA and its amici take the position that the PUC cannot adequately represent OCA's interests in this case. A state statute can inform the Rule 24(a)(2) calculus, but it cannot displace the requirement that a would-be intervenor satisfy each of the rule's prerequisites. See Washington Elec. ___ ________________ Coop., 922 F.2d at 96-98. Whatever discrepancies exist in the _____ enabling statutes of OCA and the PUC, respectively, a federal court must assess adequacy of representation in light of the issues at stake in the particular litigation. For the reasons previously discussed, the differences in the two agencies' statutory missions are without consequence here; like the Grouped Appellants, OCA can point neither to any legal argument favorable to it that the commissioners are unwilling or unable to make in defense of the Plan, nor to any legal position taken by the commissioners that compromises OCA's interests in any material way. In short, there simply is no divergence of interest between the two bodies in respect to the causes of action pleaded in this litigation.9 C. The City of Manchester. C. The City of Manchester. ______________________ Like the other five appellants, the City of Manchester  ____________________ 9Our contextualized holding should ease the amici's concern that failure to allow OCA to intervene will impair the effectiveness of similar consumer advocacy organizations in other litigation. If, for example, PSNH had included in its complaint claims that would necessitate a viewpoint-balancing analysis in which consumer concerns played a significant role, we would see OCA's appeal in a vastly different light. 26 advances arguments grounded both in an asserted economic interest and an asserted administrative-proceeding interest. To the extent that these arguments replicate those made by the Grouped Appellants, we reject them for the reasons previously articulated. Still, the city's position is different in certain respects. Manchester administers a municipal electric power aggregation program under which it procures electricity for several hundred municipal, residential, and commercial accounts. The number of accounts that it represents imbues the city with sufficient market power to acquire substantial rate discounts. Manchester supports the Plan because it believes that increased competition in the electric power market will allow it to secure even lower electric rates for the subscribers to the aggregation program. Manchester posits that this special interest as an aggregator justifies intervention as of right. Notwithstanding this twist, the district court did not believe that Manchester's interest differed appreciably from the generalized economic interest asserted by each of the other appellants. See PSNH II, 173 F.R.D. at 23, 25-26. We discern no ___ _______ abuse of discretion in that ruling. By like token, we are unmoved by the city's insistence that, as administrator of the aggregation program, its interest is not merely in lower rates, but also in fostering an electric power market open to the greatest possible number of competitors. This recharacterization is more froth than brew. When all is said and done, Manchester 27 seeks to promote a competitive market because it surmises that such a development will have a salutary effect on electric rates. Manchester also attempts to distinguish its position on the ground that, due to the aggregation program, it is registered with the PUC as a supplier of electric power. But this brings us full circle. Manchester does not assert any interest that stems from its role as a supplier other than a desire to purchase power at the lowest possible rates and to pass the resultant savings to its subscribers. Hence, the claimed distinction fails to set Manchester apart from the other appellants in any material way. Manchester has one remaining bullet in its intervention gun, but it too is a blank. The city notes that PSNH is one of its largest employers and taxpayers and, consequently, that it has a vital interest in PSNH's ability to remain a viable enterprise after market restructuring. While we have serious doubts that Manchester's paternalistic impulses satisfy Rule 24(a)(2)'s interest requirement at all, we need not decide that issue for two reasons. First, and most obviously, PSNH is the party with the singularly greatest interest in preserving its economic survival and can adequately represent that interest in this case. Second, Manchester's positions on the issues at stake in this litigation align perfectly with those of the PUC commissioners. Manchester attempts to defuse the suggestion that it stands shoulder-to-shoulder with the defendants by loudly proclaiming its disagreement with the PUC's method of calculating 28 PSNH's stranded cost recovery allowance. This is a very red herring. In the context of the lawsuit, the stranded costs issue mainly affects PSNH's takings claims. But Manchester, in its proffered answer to PSNH's complaint, see Fed. R. Civ. P. 24(c), ___ denies that any of the PUC's actions amount to a confiscatory taking. At any rate, PSNH itself adequately will represent any interest that the city may have in contesting the SCRECH methodology embodied in the Plan. Refined to bare essence, Manchester's campaign for intervention as of right reduces to its promise that it "will offer a different angle on the legal questions in this lawsuit." This campaign promise, unamplified by any specifics, cannot bear the weight of a claim that adequate representation is lacking. See Moosehead Sanitary Dist., 610 F.2d at 54. ___ ________________________ V. FLOTSAM AND JETSAM V. FLOTSAM AND JETSAM Cabletron, RMA, and the City of Manchester also have attempted to appeal from orders of the district court not directly related to intervention. Because we affirm the denial of their motions to intervene, they lack standing to press any other issues before this court. See SEC v. Certain Unknown ___ ___ ________________ Purchasers of the Common Stock of and Call Options for the Common _________________________________________________________________ Stock of Santa Fe Int'l Corp., 817 F.2d 1018, 1021-22 (2d Cir. _______________________________ 1987). Hence, we take no view of either their putative appeals of the district court's May 13 and July 7 orders or their characterization of those orders as modifications to, or extensions of, a de facto preliminary injunction. 29 In a closely related initiative, all the appellants, relying on Railroad Comm'n v. Pullman Co., 312 U.S. 496 (1941) _______________ ___________ and Burford v. Sun Oil Co., 319 U.S. 315 (1943), invite us to _______ ___________ scrutinize the district court's unwillingness to abstain from deciding this case. We decline the invitation. A district court's refusal to abstain under doctrines like Pullman or _______ Burford is not an immediately appealable event. See Gulfstream _______ ___ __________ Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 278 (1988). _______________ ________________ Thus, acceding to the appellants' request would place this court in the bizarre situation of deciding a nonappealable order at the behest of non-parties. Let us be perfectly clear. We recognize that the appellants make some strong arguments in support of abstention. The district court, if it so chooses, is free to revisit the issue. At this point in the litigation, however, that court is the only tribunal with authority to address the question. VI. CONCLUSION VI. CONCLUSION We need go no further. The future direction of the electric utility market in New Hampshire is a matter of utmost importance, but parties who are merely interested in the outcome of a case do not automatically qualify for intervention as of right under Rule 24(a)(2). Under the totality of the circumstances that obtain here, we discern no abuse of discretion in the district court's determination that the appellants are among that number. In Nos. 97-1762, 97-1763, 97-1773, 97-1780, 97-1805 and In Nos. 97-1762, 97-1763, 97-1773, 97-1780, 97-1805 and _______________________________________________________ 97-2070, the orders denying intervention are affirmed. The 97-2070, the orders denying intervention are affirmed. The __________________________________________________________ ___ remaining appeals are dismissed for want of appellate remaining appeals are dismissed for want of appellate _________________________________________________________________ 30 jurisdiction. Costs shall be taxed in favor of plaintiffs jurisdiction. Costs shall be taxed in favor of plaintiffs ____________ ________________________________________________ against all appellants. against all appellants. ______________________ 31