USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1277

 MASSACHUSETTS FOOD ASSOCIATION, ET AL.,

 Plaintiffs, Appellants,

 v.

 MASSACHUSETTS ALCOHOLIC BEVERAGES CONTROL COMMISSION, ET AL.,

 Defendants, Appellees.
 ____________________

No. 99-1280

 MASSACHUSETTS FOOD ASSOCIATION, ET AL.,

 Plaintiffs, Appellees,

 v.

 MASSACHUSETTS ALCOHOLIC BEVERAGES CONTROL COMMISSION, ET AL.,

 Defendants, Appellees,

 and

 WINE & SPIRIT WHOLESALERS OF MASSACHUSETTS, INC., ET AL.,

 Appellants.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Bownes, Senior Circuit Judge,
 
 and Lipez, Circuit Judge.
 
 
 
 
 J. Mark Gidley with whom Robert D. Paul, J. Christian Word,
White & Case LLP, Alan L. Kovacs, Howard J. Wayne, Eugene R.
Richard and Wayne, Richard, Hurwitz & McAloon were on brief for
plaintiffs.
 Jane L. Willoughby, Assistant Attorney General, with whom
Thomas F. Reilly, Attorney General, and Thomas A. Barnico,
Assistant Attorney General, were on brief for defendants.
 Bruce A. Singal with whom William C. Athanas, Donoghue,
Barrett & Singal, P.C., Louis A. Cassis, Cassis, Arena & Cayer and
Ernest Gellhorn were on brief for intervenor, appellants Wine &
Spirit Wholesalers of Massachusetts, Inc., et al.
 Bruce A. Singal, William C. Athanas, Donoghue, Barrett &
Singal, P.C., Louis A. Cassis, Cassis, Arena & Cayer and Ernest
Gellhorn on brief for Massachusetts Package Stores Association,
Inc., Wine & Spirits Wholesalers of Massachusetts, and
Massachusetts Wholesalers of Malt Beverages, Inc., Amici Curiae. 

December 2, 1999

 
 
 BOUDIN, Circuit Judge. Massachusetts, like many other
states, extensively regulates the sale of alcoholic beverages. 
Among other restrictions, retail outlets must be licensed, each
license embraces only a single location, and no firm or person is
allowed "more than three such licenses in the commonwealth . . . ." 
Mass. Gen. Laws ch. 138, 15 (1998). Thus, no one can own more
than three retail liquor stores in the Commonwealth. Although some
state regulations also impinge on retail prices, e.g., Mass. Gen.
Laws ch. 138, 25C, they are not at issue here. 
 The plaintiffs in this case--who include several
supermarket chains--brought this action in the district court to
enjoin enforcement of the three-store limit. The complaint charged
that this statutory restriction conflicted with the Sherman Act, 15
U.S.C. 1, et seq., because it would be a per se violation of the
Sherman Act for private competitors to agree with each other to
impose such a limitation. The complaint further alleged that the
defendants, the members of the Massachusetts Alcoholic Beverages
Control Commission, lacked power to supervise, and did not in fact
supervise, the anticompetitive consequences of this limitation
(i.e., less competition and higher prices).
 Several organizations moved to intervene to defend the
statute. One of them, the Massachusetts Package Stores Association
("MPSA"), is a trade association primarily representing retail
liquor stores. The other two organizations--The Wine & Spirits
Wholesalers of Massachusetts and the Massachusetts Wholesalers of
Malt Beverages--are trade associations for alcoholic beverage
wholesalers in Massachusetts. All three entities sought to
intervene as of right or, in the alternative, as permissive
intervenors. Fed. R. Civ. P. 24(a)(2), (b)(2). The Commission and
its members moved to dismiss the complaint for failure to state a
claim. Fed. R. Civ. P. 12(b)(6). After briefing and argument, the
district court, on January 6, 1999, denied intervention to the
trade associations but granted the defendants' motion to dismiss. 
Massachusetts Food Ass'n v. Sullivan, 184 F.R.D. 217, 228 (D. Mass
1999).
 The plaintiffs in the district court now appeal from the
dismissal of their complaint. The trade associations that sought
to intervene appeal from the denial of intervention (but in an
amicus brief support the dismissal of the complaint). Our review
of the judgment of dismissal is de novo. Rogan v. Menino, 175 F.3d
75, 77 (1st Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3274
(U.S. Oct. 14, 1999) (No. 99-646). Since we affirm the judgment of
dismissal, the intervention issue is largely (although not
entirely) academic, and we return to it only after addressing the
merits.
 At first blush, one might think this a strange complaint. 
The state statute limiting retail liquor outlets looks like a
garden-variety act of local legislation limiting the number of
licenses that the state will grant, and the statute neither
authorizes nor directs private parties to engage in anticompetitive
agreements among themselves. Putting aside the special status of
state liquor regulation under the Twenty-First Amendment, U.S.
Const. amend. XXI, 2, one of the best settled rules in antitrust
law is that the Sherman Act was not intended to "apply" to the
states so as to foreclose otherwise valid state regulation. Parker
v. Brown, 317 U.S. 341, 350-52 (1943); see also Neo Gen Screening,
Inc. v. New England Newborn Screening Program, 187 F.3d 24, 28 (1st
Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3263 (U.S. Oct.
8, 1999) (No. 99-617); Tri-State Rubbish, Inc. v. Waste Management,
Inc., 998 F.2d 1073, 1076 (1st Cir. 1993). But, as we shall see,
there are qualifications on this general rule, and the case law is
not entirely coherent. See generally I Areeda & Hovenkamp,
Antitrust Law 221 (1997). With some ingenuity, the plaintiffs in
this case have sought to make the most of the resulting
ambiguities.
 Almost from the outset, the immunity from the Sherman Act
afforded to "state action" has been hedged by a concern with state
laws deemed merely to authorize or direct conduct by private
parties that--absent such state legislation--would violate the
antitrust laws. Cf. Parker, 317 U.S. at 351-52. It is one thing
to say that a state may itself regulate in an "anticompetitive"
fashion; it is quite another to say that the state can effectively
exempt private parties from obeying the antitrust laws. Thus, a
state cannot shield private parties from the federal antitrust laws
by enacting a statute saying no more than that competing grocery
stores may agree to fix prices; through the Supremacy Clause, the
Sherman Act would preempt such a law.
 This qualification is itself qualified. Under certain
conditions, the states have been allowed to authorize or direct
private conduct otherwise inconsistent with the Sherman Act. The
main conditions are that the state do so as part of a deliberate
policy to displace competition and that the state provide an
alternative regime that provides "active supervision" of the
conduct, Patrick v. Burget, 486 U.S. 94, 100 (1988); an example
would be a specific authorization for joint ratemaking by
intrastate carriers coupled with state agency authority to require
that the resulting rates be just and reasonable. Southern Motor
Carriers Rate Conference, Inc. v. United States, 471 U.S. 48
(1985); see I Areeda, supra, 226.
 What state entities can adopt such a policy (state
executives? local municipalities?), how clearly the policy must be
articulated, and (above all) what kind of supervision will suffice
are among the issues that have provoked endless litigation. See I
Areeda, supra, 226. For example, supervision may be a proxy for
competition, designed to protect consumers (e.g., utility
regulation); but supervision is not clearly limited to cases of
this character. See, e.g., Patrick, 486 U.S. at 100-01 (suggesting
that state supervision reinforces requirement that anticompetitive
behavior at issue be consistent with the state's deliberate
policy). 
 But our facts do not require an examination of clear
articulation, active supervision or other conditions for immunity. 
It is only where state legislation "would otherwise" be preempted
by the Sherman Act that these further inquiries are required. 
Fisher v. City of Berkeley, California, 475 U.S. 260, 265 (1986). 
In this case, the state has not ordered or authorized private
parties to engage in conduct that, absent immunity, would even
arguably violate the antitrust laws; there is no private agreement
or arrangement between retailers as to the number of retail outlets
and therefore no violation to be shielded. The state simply
insists upon licensing retail liquor stores--as it does for many
businesses or professions--and limits the number of licenses to
three per owner.
 Despite disclaimers, the plaintiffs' case rests in the
end on the implicit proposition that the Massachusetts statute is
preempted because it produces an effect that could not be produced
by agreement of private parties without violating the antitrust
laws. Admittedly, private parties could not agree that each of
them would operate only three such outlets. United States v. Topco
Associates, Inc., 405 U.S. 596 (1972); Addamax Corp. v. Open
Software Found., Inc., 152 F.3d 48, 51 (1st Cir. 1998). This
resemblance in effects is the gist of the plaintiffs' position,
although it is narrowed by the suggestion that preemption may be
confined to statutes that produce the same effect as a per se
violation (rather than a non-per se one); and, of course,
plaintiffs concede that even a per se violation would be all right
if the requisite state policy and active supervision existed.
 The difficulty with this "similar effects" argument is
that much direct government regulation prohibiting one form of
economic activity or requiring another involves directives that
private parties could not themselves implement without violating
the antitrust laws. For example, competing shoe stores could not
agree on closing hours or holidays without committing per se
violations of the antitrust laws; nor could competing taxi
companies agree on the number of taxicabs to be operated; nor could
cable companies agree that only one or two of them should serve a
locality. Yet all of these results are examples of commonplace
state or local regulation, sometimes accompanied by local price
regulation but sometimes not.
 To allow federal judges to decide which of these
legislative enactments should survive and which should be condemned
comes close to reintroducing the kind of judgments that got the
Supreme Court into so much trouble in the Lochner era. The result
might well be more competition and greater consumer welfare. But
it would come at the cost of second-guessing the democratically
elected legislature's decisions about the proper balance between
competition and other social policies that are commonly reflected
in such legislation. The Sherman Act is a "charter of economic
liberty," Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 4
(1958), but only as against private restraints.
 From these examples, it is evident that one must be
careful in parsing general statements to the effect that states may
not compel "private parties to engage in anticompetitive behavior." 
324 Liquor Corp. v. Duffy, 479 U.S. 335, 345-46 n.8 (1987). What
is centrally forbidden is state licensing of arrangements between
private parties that suppress competition--not state directives
that by themselves limit or reduce competition. This is the very
distinction stressed by the Supreme Court in Fisher where it
sustained the City of Berkeley's rent control ordinance (rent
control being a classic constraint on competitive pricing). As the
Court there explained,
 [a] restraint imposed unilaterally by
 government does not become concerted-action
 within the meaning of the statute simply
 because it has a coercive effect upon parties
 who must obey the law. The ordinary
 relationship between the government and those
 who must obey its regulatory commands whether
 they wish to or not is not enough to establish
 a conspiracy.

Fisher, 475 U.S. at 267.
 The only fact patterns that give the plaintiffs any
purchase is a set of Supreme Court decisions that struck down state
statutes that were deemed to direct and implement private conduct
replicating resale price maintenance schemes. The schemes were
structured to allow one party (manufacturer or wholesaler) to set
the resale price to be charged by purchasers at the next level. 
The resemblance in form and function to traditional private resale
price maintenance, see Dr. Miles Medical Co. v. John D. Park &
Sons, Co., 220 U.S. 373 (1911), was so close that the Supreme Court
treated the arrangements as if they were nothing other than private
resale price maintenance schemes licensed and abetted by the state.
 There are no private restraints in this case, whether
operating alone or in conjunction with state action. Cf. Duffy,
479 U.S. at 345 n.8. The Massachusetts statute limiting licenses
to three per company does not authorize or direct any private
agreements or permit any competitor to determine the price or
location of another. The three-store limit is no more an agreement
among competitors, or subordination of one competitor to the
dictates of another, than a state electrical code that prescribes
safety standards for contractors who wire buildings for
electricity. As in Fisher, the restrictions have been
"unilaterally imposed by government . . . to the exclusion of
private control." Fisher, 475 U.S. at 266.
 Our conclusion in no way depends on the premise that the
Massachusetts three-store limit serves the public interest or on
the amici's dubious suggestion that the limit has no effect on
price or output. Whatever its purported or actual purpose, cf.
Johnson v. Martignetti, 375 N.E.2d 290, 297 (Mass. 1978), it is
common knowledge that many statutes regulate private activities to
protect the narrow economic interests of other companies, often to
the detriment of the public. See Frank H. Easterbrook, Antitrust
and the Economics of Federalism, 26 J.L. &. Econ. 23, 23-24 (1983). 
But unless such a statute licenses or commands a private restraint,
this is a matter for the voters and not for the federal courts--at
least so far as the Sherman Act is concerned. Of course, such
state statutes remain subject to the constraints of the Commerce
Clause and other constitutional provisions.
 This brings us to the separate question whether MPSA and
the two wholesaler trade associations should have been allowed to
intervene. The district court held that the wholesalers' interests
were too general and contingent to justify intervention; in the
case of MPSA, whose members were subject to the very three-store
regulation challenged by plaintiffs, the court said that its
members did have a direct and concrete interest in defending the
statute but that they were adequately represented by the
Commonwealth. As for permissive intervention, the court found that
all three trade associations could adequately express their views
through amicus briefs.
 The problem presented in this case is a common one: a
private party attacks a regulatory statute or administrative rule;
the state or its regulators are its defendants; and other parties
having an economic interest in the validity or invalidity of the
statute or regulation seek to intervene. The standard for
intervention as of right is set forth in Rule 24(a)(2) as follows:
 Upon timely application anyone shall be
 permitted to intervene in an action: . . .
 when the applicant claims an interest relating
 to the property or transaction which is the
 subject matter of the action and the applicant
 is so situated that the disposition of the
 action may as a practical matter impair or
 impede the applicant's ability to protect that
 interest, unless the applicant's interest is
 adequately represented by existing parties.

In such cases, the timeliness of intervention and the practical
impact on the would-be intervenor are rarely in dispute: it is the
"interest" and "adequately represented" criteria that are usually
decisive.
 Rule 24(a)(2)'s reference to "an interest relating to the
property or transaction" suggests that the drafters had in mind
something narrower and more akin to property or contract interests
in conventional private litigation as the necessary stake; but this
narrow reading has not been accepted in practice. See Daggett v.
Commission on Governmental Ethics and Election Practices, 172 F.3d
104, 110 (1st Cir. 1999). We will therefore assume that the
district court was right in holding that MPSA satisfied the
"interest" requirement and assume arguendo (and solely to shorten
the opinion) that the district court was wrong in holding that the
wholesalers lacked such an interest.
 But, perhaps as a counterweight to the broad reading of
"interest," the courts have been quite ready to presume that a
government defendant will "adequately represent" the interests of
all private defenders of the statute or regulation unless there is
a showing to the contrary. See Public Serv. Co. v. Patch, 136
F.3d 197, 207 (1st Cir. 1998). And while there are various ways to
show that state representation is not adequate, the burden of
overcoming the presumption is upon the would-be intervenor,
Daggett, 172 F.3d at 111. The trial court, in applying a general
rule to specific facts, is usually accorded a measure of deference
in making the adequate-representation determination, so long as the
court applies the proper legal standards. Id. at 111-12.
 The would-be intervenors argue that the Commonwealth
cannot be an adequate representative of their interests while it
also regulates them. In support of this position, they point to
Conservation Law Found. v. Mosbacher, 966 F.2d 39 (1st Cir. 1992),
and the district court opinion in Patch, 173 F.R.D. 17 (D.N.H.
1997). In Mosbacher, we held that commercial fishing groups could
intervene as of right to oppose a challenge to a state agency's
approval of a fishery plan, noting that the fishing groups were
regulated by the agency. Mosbacher, 966 F.2d at 44. In Patch, the
district court allowed intervention by several electric utilities
who were largely aligned with state regulators in defending a major
state reform plan that restructured retail power regulation in the
state. Patch, 173 F.R.D. at 27-28. From these decisions, MPSA
infers a general rule that the state defendant's representation is
inadequate as a matter of course whenever it is also the regulator
of the entity that seeks to intervene.
 The cases do not support such a per se rule. We
certainly did not adopt such a rule in Mosbacher, where the
intervenors overcame the presumption of adequate representation by
the government defendant because, inter alia, the agency had not
filed an answer to the complaint but had instead accepted a consent
decree providing for virtually all the relief sought and subjecting
the fishing groups to more stringent rules than had previously been
in effect. Id. at 44. It is not clear whether the district court
was applying a per se rule in Patch; but in any event that part of
its decision was not appealed to us.
 Here, there is no doubt that the Commonwealth was
zealously interested in upholding the validity of the statute. The
only difference between it and the would-be intervenors was their
interest in offering other legal arguments (for example, based on
the Twenty-First Amendment) to sustain the statute. But these
arguments were easily presented in amicus briefs. This is not a
case where the complaint was framed so as to require an evidentiary
determination and where the would-be intervenors had information
that could only be presented by their participation as parties. 
See generally Daggett, 172 F.3d at 112.
 The would-be intervenors point out that an amicus does
not enjoy the same opportunities as a full-fledged litigant even to
offer legal argument; for example, in this court, amicus briefs are
shorter than regular briefs and oral argument is at the court's
discretion. Fed. R. App. P. 29(d),(g). But a court is usually
delighted to hear additional arguments from able amici that will
help the court toward right answers, and the amici can easily seek
a larger allotment of pages or time to participate in oral
argument. See id.
 The more interesting claim is that the Commonwealth might
refuse to appeal if it lost; or--if it won and plaintiffs sought
certiorari--the Supreme Court might limit the questions to be
considered to those set forth in the certiorari petition. But
amici, like respondents, can advise the Supreme Court of missing
arguments. Davis v. United States, 512 U.S. 452, 457 n.* (1994)
(citing Teague v. Lane, 489 U.S. 288, 300 (1989) (plurality
opinion)). And if the Commonwealth refused to appeal from a
defeat, a would-be intervenor could then seek to intervene. 7C
Wright, Miller & Kane, Federal Practice and Procedure 1909, at
345 & n.38 (1986); see also Daggett, 172 F.3d at 112.
 As for permissive intervention, the would-be intervenors
likely met the low threshold set by Rule 24(b)--that their defenses
included questions of law common to the defenses offered by the
state. Fed. R. Civ. P. 24(b). But even where this necessary
condition is present, the rule merely permits intervention at the
discretion of the district court. Daggett, 172 F.3d at 112-13. 
The district court reasonably concluded that the Commonwealth was 
adequately representing the interests of everyone concerned to
defend the statute and that any variations of legal argument could
adequately be presented in amicus briefs. We see no abuse of
discretion in this ruling.
 Affirmed.