Beverly C. DAGGETT, et al., Plaintiffs, Appellees,

v.

COMMISSION ON GOVERNMENTAL ETHICS AND ELECTION PRACTICES, et al., Defendants, Appellees.

Betheda Edmonds, et al., Proposed Intervenors–Defendants, Appellants.

No. 99–1187.

United States Court of Appeals, First Circuit.

Argued March 4, 1999.

Decided April 9, 1999.

---

Gillian E. Metzger with whom Glenn J. Moramarco, Brennan Center for Justice at New York University School of Law, John R. Brautigam and Arn H. Pearson, Maine Citizen Leadership Fund, were on brief, for appellants Betheda Edmonds, Kathleen McGee, Linda McKee, Peggy Pendleton and Elizabeth Watson.

Mark Lopez, American Civil Liberties Union Foundation, with whom Nat Rosenblatt and Farrell, Rosenblatt & Russell were on brief, for plaintiffs, appellees Beverly C. Daggett, Elaine Fuller, Christopher M. Harte, Mark T. Cenci, Jeffrey I. Weinstein, Shawn Levasseur and Libertarian Party of Maine.

James Bopp, Jr. with whom Robert J. Newmeyer, Heidi K. Meyer, Bopp, Coleson & Bostrom, Daniel M. Snow and Pierce Atwood were on brief, for plaintiffs, appellees Rollin Stearns, Maine Right to Life Committee Political Action Committee State Candidate Fund, and National Right to Life Political Action Committee State Fund.

Andrew S. Hagler, Assistant Attorney General, Phyllis Gardiner, Assistant Attorney General, Andrew Ketterer, Attorney General, and Paul Stern, Deputy Attorney General, Chief, Litigation Division, on brief, for defendants, appellees.

Before BOUDIN and LYNCH, Circuit Judges, and MAGILL,[*] Senior Circuit Judge.

BOUDIN, Circuit Judge.

This appeal, by applicants whose motion to intervene was denied, stems from Maine's enactment in November 1996 of a set of campaign reform statutes. Adopted by Maine voters through a ballot initiative, the statute—denominated "An Act to Reform Campaign Finance" ("the Reform Act")—included both public funding of state campaigns and extensive regulation of contributions and expenditures. 1996 Me. Legis. Serv. Initiated Bill ch. 5 (I.B.5) (L.D.1823) (West).

The public financing provisions, called the Maine Clean Election Act, Me.Rev. Stat. Ann. tit. 21–A, § 1121 *et seq.*, offer participating candidates full public funding, eliminating the need for any fundraising by candidates after they initially qualify. To qualify, a candidate must obtain $5 contributions from a number of registered voters, the number depending on the office sought (*e.g.*, 50 contributions for a candidate for state representative). *Id.* §§ 1122(7), 1125(3). The contributions must be collected during the first half of the year in which the election occurs. *Id.* § 1122(8). (The period starts slightly earlier—November 1 of the preceding year— for gubernatorial candidates. *Id.*).

In addition to initial funding both for the primary and general elections, participating candidates get extra funds—up to a limit of 200 percent of the initial outlay—to the extent that nonparticipating opponents (or funds spent on their behalf) exceed the initial distribution. Me.Rev.Stat. Ann. tit. 21–A, § 1125(9). The participating candidates may describe themselves as Maine Clean Election Act candidates. *Id.* §§ 1122(1), 1125(5). In exchange for all of these benefits, the candidates agree not to spend more than the state's contributions. *Id.* § 1125.

For those candidates who decline to participate in the public funding program, the Reform Act imposes new limitations. Permissible contributions to such candidates are reduced—as to any contributing individual or group—to $250 for legislative races and $500 for gubernatorial races. Me.Rev.Stat. Ann. tit. 21–A, §§ 1015(1),

---

[*] Of the Eighth Circuit, sitting by designation.

(2), 1056(1). Nonparticipating candidates must also comply with expedited reporting requirements that are not applicable to publicly funded campaigns. *Id.* § 1017(3–B). Independent expenditures are not limited, but the matching fund provisions for participating candidates are triggered by independent expenditures as well as by direct expenditures. *Id.* § 1125(9).

In 1997, after adoption of the statute, it was promptly challenged in lawsuits in the district court. They were dismissed as premature, since the statute only became effective on January 1, 1999, and will apply for the first time in the November 2000 elections. However, it will now affect fund-raising that may begin as early as the summer of 1999. Accordingly, on November 4, 1998, a group of plaintiffs brought the *Daggett* lawsuit against the Maine commission that administers the new statute, the commission's members, the Maine Secretary of State and the Maine Attorney General (collectively, "the state defendants"). *See Daggett v. Webster,* No. 98–223–B—H (D. Me. compl. filed Nov. 4, 1998).

The *Daggett* plaintiffs are six individuals, including candidates who previously ran for the state legislature, a citizen who contributes, and the Libertarian Party of Maine. The plaintiffs sought injunctive relief barring enforcement both of the public funding provisions and various of the regulatory limitations. Less than a month later, another set of plaintiffs brought the *Stearns* suit against the commission members, challenging the contribution limits and the provision for matching distributions based on independent expenditures. *See Stearns v. Webster,* No. 98–239–B–H (D. Me. compl. filed Dec. 4, 1998). The two cases were subsequently consolidated. *See Daggett v. Webster,* No. 98–223 (D. Me. order filed Jan. 4, 1999).

Within two weeks after the *Daggett* suit was filed, the present five appellants moved to intervene. Appellants are current officeholders or prospective candidates, all of whom intend to run for election in 2000, using public funding provided for by the Maine Clean Election Act. They sought intervention as of right under Fed. R.Civ.P. 24(a)(2) or, in the alternative, permissive intervention under Rule 24(b)(2). The plaintiffs in both cases opposed the motion, while the state defendants welcomed intervention.

On December 23, 1998, the district court set an expedited schedule for designation of experts, discovery, a trial (or stipulated record), and briefing of issues with final oral argument scheduled for June 3, 1999. Thereafter, on January 19, 1999, the district court entered the order now under review denying intervention by the applicants. *Daggett v. Webster,* 34 F.Supp.2d 73 (D.Me.1999). After applicants appealed, the district court suspended the scheduling order. This court expedited the appeal in light of the parties' representations as to the need for an urgent resolution.

The district court's decision to deny intervention as of right rested on the ground that, in the words of the rule, "[t]he applicant's interest is adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). The district court said that the Maine Attorney General's goals were "identical to those of the would-be intervenors" and the Attorney General was fully able to mount "a strong defense in support of the statute." *Daggett,* 34 F.Supp.2d at 75. The court relied directly upon this court's decision in *Moosehead Sanitary District v. S.G. Phillips Corp.,* 610 F.2d 49, 54 (1st Cir.1979). *See Daggett,* 34 F.Supp.2d at 75.

The district court also denied permissive intervention, available in the court's discretion where the applicant's claim or defense and the main action have "a question of law or fact in common." Fed.R.Civ.P. 24(b). The court said that the intervenors' interest in supporting the new campaign legislation could be adequately satisfied by permitting them to participate as amicus curiae (which permission the court gave), and that additional defendants would only

"complicate the proceedings without adding any advantage." *Daggett,* 34 F.Supp.2d at 76.

■ The order denying intervention is appealable now. *See Public Serv. Co. v. Patch,* 136 F.3d 197, 204 (1st Cir.1998). The standard of review on appeal is "abuse of discretion" circumscribed by the specific standards set forth in the applicable rule, *id.;* but, as always, abstract issues of law (such as the proper standards for evaluating intervention motions) are reviewed *de novo.* This appeal turns primarily on the applicants' claim that the district court misconstrued and then misapplied the rule governing intervention as of right which reads:

> [1] Upon timely application anyone shall be permitted to intervene in an action: ... when [2] the applicant claims an interest relating to the property or transaction which is the subject matter of the action and [3] the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, [4] unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2) (brackets added by us).

In this instance, the first requirement of timeliness was easily met. The second requirement—that the applicant possess a protectable "interest"—was not directly addressed by the district court. However, on appeal, the *Daggett* plaintiffs assert that the applicants lack a protectable interest. The *Stearns* plaintiffs make a related argument that the applicants lack Article III standing; on the latter argument the applicants say that they do have such standing but that it is in any event unnecessary for intervenors as of right.

■ Where required, standing is fundamental, *see United States v. AVX Corp.,* 962 F.2d 108, 113–15 (1st Cir.1992), and we begin with this issue. Interestingly, the circuits are divided as to whether an intervenor as of right must possess standing under Article III, and the Supreme Court has reserved judgment on the point.[1] This circuit has not taken a position on the issue nor need we decide it here, as we believe that the applicants have a sufficient stake in the outcome to meet the rather modest requirements of Article III.

■ The case law interpreting standing requirements under Article III is, to put it mildly, "one of the most confused areas of the law." Chemerinsky, *Federal Jurisdiction* § 2.3.1, at 48 (1989). Standing doctrine is multifaceted, serving several different interests, and must cope with a great variety of factual situations. The core requirement—buttressed by some collateral concerns—is that the person claiming standing must have a concrete stake in a controversy suitable for court resolution. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

In this instance, the applicants do have a concrete stake in the outcome. Each intends to run in the upcoming Maine election and desires public funding; if the plaintiffs' challenge is successful, each applicant will lose the opportunity for direct payment by the state that would otherwise accrue. Highly contingent interests are sometimes found to be insufficient, *see, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 564, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), but the only apparent uncertainty here is whether the applicants can qualify; given the number of modest contributions required, it would be surprising

1. *See Diamond v. Charles,* 476 U.S. 54, 68–69 & n. 21, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986). *Compare, e.g., Mausolf v. Babbitt,* 85 F.3d 1295, 1300 (8th Cir.1996) (standing required) *with Associated Builders & Contractors v. Perry,* 16 F.3d 688, 690 (6th Cir.1994) (standing not required).

if the applicants had much difficulty qualifying.

■ The more difficult objection for the applicants, said to be a "prudential limit[ ]" that Congress could override, Chemerinsky, *supra*, § 2.3.1, at 52, is that a party to claim standing must have an interest distinct from that of every other citizen or taxpayer. *Valley Forge*, 454 U.S. at 476–79, 102 S.Ct. 752; *United States v. Richardson*, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). This rubric rests on multiple concerns, including displeasure with claims by individuals whose interest is infinitely diluted, rests solely on ideological grounds, or could be replicated by an unlimited number of parties or would-be intervenors. *Cf. Richardson*, 418 U.S. at 179–80, 94 S.Ct. 2940.

The applicants here are not just any Maine citizens professing an interest in good government: the applicants will receive direct funding if the statute is upheld. The number of persons who can plausibly claim to be in this position is far narrower than the citizenry at large. Indeed, the applicants' claim to standing appears as good as that of the plaintiffs insofar as plaintiffs are attacking public funding, although not quite the same as claims of plaintiffs who could face criminal conviction for violating the new contribution limits.

■ This brings us to the related claim that the applicants fail to meet the second and third requirements for intervention as of right, namely, that applicants claim "an interest relating to the property or transaction which is the subject of the action" and that the "disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest," Fed.R.Civ.P. 24(a)(2). Although the two are not identical, the "interest" required under Rule 24(a) has some connection to the interest that may give the party a sufficient stake in the outcome to support standing under Article III. *See Diamond*, 476 U.S. at 68–69, 106 S.Ct. 1697.

Read literally, the "property or transaction" reference of Rule 24(a) might appear to require a specific piece of property or contract, and the drafters may have intended a narrow reading. *See* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure: Civil 2d* § 1908, at 270–71 (1986). However, the case law has effectively rejected the narrow reading, although clear outer boundaries have yet to be developed. *Id.* § 1908, at 278–300; *see generally Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 41–42 (1st Cir.1992). The principal Supreme Court cases in point are few and are "heavily colored by their unusual facts." Wright, *Federal Courts* § 75, at 541 n. 12 (5th ed.1994).

We think it is enough that the applicants belong to a small group, quite distinct from the ordinary run of citizens, who could expect to receive direct payments for their campaigns if the Reform Act is upheld but not otherwise. *See New York Pub. Interest Research Group, Inc. v. Regents of the Univ. of the State of N.Y.*, 516 F.2d 350, 351–52 (2d Cir.1975); *see also Patch*, 136 F.3d at 205–06. *Patch* itself, where we upheld the denial of intervention by some electricity consumers in a proceeding involving New Hampshire rate deregulation, was a very different kettle of fish; there the customers had interests identical—except in degree—to those of all other consumers of electricity in New Hampshire. *Id.* at 205.

Similarly, there can be no real dispute that the applicants' interests would be adversely affected if the present suit were lost by the defendants. While the applicants might not in a strict *res judicata* sense be "bound" by the decision that the Maine statute was unconstitutional, the state commission could be subject to a federal court injunction against implementation of the statute. The "practical" test of adverse effect that governs under Rule 24(a) is easily satisfied here. *See Atlantis*

*Dev. Corp. v. United States,* 379 F.2d 818, 824–25 (5th Cir.1967).

■ This brings us to the heart of the case: whether the district court erred in determining that the "applicant's interest is adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). Although the quoted language is prefaced with the word "unless," the case law is settled that the applicant for intervention must identify any inadequacy of representation. *See Trbovich v. United Mine Workers,* 404 U.S. 528, 538 & n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972); *Patch,* 136 F.3d at 207. We need not decide if this is a shift only in the burden of production rather than the burden of persuasion. *See* Wright, Miller & Kane, *supra,* § 1909, at 314–16.

■ In all events, the applicants' obligation to offer reasons or evidence is independently established by two converging presumptions triggered because the Attorney General is prepared to defend the statute in its entirety. One is that adequate representation is presumed where the goals of the applicants are the same as those of the plaintiff or defendant, *see Kneeland v. NCAA,* 806 F.2d 1285, 1288 (5th Cir.1987); *Moosehead,* 610 F.2d at 54; the other is that the government in defending the validity of the statute is presumed to be representing adequately the interests of all citizens who support the statute. *Patch,* 136 F.3d at 207.[2]

■ Nevertheless, such presumptions can be rebutted, and the applicants in this case make a double-barreled attack. The first is a claim that the district judge misapprehended the legal test of inadequate representation. To that end, the applicants point to the following passage in the district court's decision:

As the First Circuit stated in *Moosehead Sanitary Dist. v. S.G. Phillips Corp.,* 610 F.2d 49, 54 (1st Cir.1979): "Where the party seeking to intervene has the same ultimate goal as a party already in the suit, courts have applied a presumption of adequate representation. To overcome that presumption, petitioner ordinarily must demonstrate adversity of interest, collusion, or nonfeasance." No such demonstration has been made here.

*Daggett,* 34 F.Supp.2d at 75.

This trilogy—"adversity of interest, collusion or nonfeasance"—may trace back to a decision by then-Judge Blackmun. *Stadin v. Union Elec. Co.,* 309 F.2d 912, 919 (8th Cir.1962), *cert. denied,* 373 U.S. 915, 83 S.Ct. 1298, 10 L.Ed.2d 415 (1963). Judge Blackmun evidently did not intend this to be an exclusive list, nor did we in *Moosehead.* As Wright, Miller & Kane point out (in criticizing the courts that have misread the statement as exclusive), "[t]he wide variety of cases that come to the courts would make it unlikely that there are three and only three circumstances that would make representation inadequate." Wright, Miller & Kane, *supra,* § 1909, at 318.

Whether the district court was misled by our earlier *Moosehead* language is a different issue that we will return to below. The issue would be irrelevant if we agreed with the applicants' alternative attack under Rule 24(a)(2), to which we now turn. In substance, the applicants say that however *Moosehead* might be construed, the district court was *required* on this record to decide that representation by the state was not adequate. If so, outright reversal rather than a possible remand would be warranted. But the applicants' burden is a heavy one, since adequacy is primarily a fact-sensitive judgment call and the stan-

---

2. The district court noted that decisions adopting the presumption in favor of adequate government representation often involve the government suing as plaintiff in its *parens patriae* capacity. *See Daggett,* 34 F.Supp.2d at 75 n. 2. *Patch* follows the same principle in cases where the government is defending a statute against attack. *See Patch,* 136 F.3d at 207. Of course, there may be other cases involving government representation where no presumption is justified.

dard of review is deferential. *See Patch,* 136 F.3d at 204.

■ The applicants' arguments to show inadequacy fall conveniently under two headings. The first is that an actual conflict of interests exists, making it likely here that the Maine Attorney General will not adequately represent the interests of the applicants. Sometimes such a danger can be discerned from actions that an existing party has already taken, *see Mosbacher,* 966 F.2d at 44 (acquiescence in consent decree), and sometimes it can be reasonably predicted. *See id.* at 44–45 (government has conflicting interests in the matter); *see also Dimond v. District of Columbia,* 792 F.2d 179, 192–93 (D.C.Cir. 1986).

However, in this instance no such conflict has been shown. The general notion that the Attorney General represents "broader" interests at some abstract level is not enough. *Patch,* 136 F.3d at 207–08. The Attorney General is prepared to defend the constitutionality of the Reform Act in full, and there is no indication that he is proposing to compromise or would decline to appeal if victory were only partial. *Compare Mosbacher,* 966 F.2d at 44. If and when there is such a compromise or refusal to appeal, the question of intervention on this ground can be revisited. *Cf. Meek v. Metropolitan Dade County,* 985 F.2d 1471, 1478–79 (11th Cir.1993).

■ Alternatively, applicants say that while the Attorney General may defend the Reform Act, his arguments will differ from their own. Of course, the use of different arguments as a matter of litigation judgment is not inadequate representation *per se. See Stadin,* 309 F.2d at 919. But one can imagine cases where— even in the absence of any conflict of interest—a refusal to present obvious arguments could be so extreme as to justify a finding that representation by the existing party was inadequate.

In this case, the applicants say the Attorney General may hesitate to justify the statute by pointing to alleged corruption associated with the pre-reform Maine election system. The reason for this supposed hesitation is, the applicants say, that the Attorney General is appointed by the state legislature. However, the Attorney General is representing the state as he is directed to do by Maine law, *see* Me.Rev. Stat. Ann. tit. 5, § 191, and it would take more than speculation to show that he is likely to soft-pedal arguments so clearly helpful to his cause—and perhaps even essential to it, *cf. Federal Election Com'n v. National Conservative Political Action Committee,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985).

Admittedly, the Attorney General's memorandum supporting applicants' intervention motion refers to discussions with applicants and some unidentified differences in approach. However, the applicants, who presumably could have done so, did not say squarely to the district court that the Attorney General is refusing to present the arguments in question to the extent that they have a basis in fact. Thus, on this record, the district court had no basis to conclude that representation was inadequate on this score.

Even if the state were not prepared to stress this corruption issue, so-called "legislative facts," which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no application to legislative facts. *See* Fed.R.Evid. 201 advisory committee's note; *cf. Knight v. Dugger,* 863 F.2d 705, 742 (11th Cir. 1988) (discussing judicial notice of social facts). There may be instances where the amicus brief would not do the job, but once again applicants have made no showing on this point.

■ Passing intervention as of right, the applicants independently argue that they should have been granted permissive intervention under Rule 24(b)(2), which gives the judge discretion to allow

intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Applicants have seemingly satisfied this threshold requirement. In that event, the district court can consider almost any factor rationally relevant but enjoys very broad discretion in granting or denying the motion. *See, e.g., United States Postal Serv. v. Brennan,* 579 F.2d 188, 191–92 (2d Cir. 1978).

■ The applicants argue that their intervention would not cause delay and that the state welcomes their intervention; but their affirmative argument for allowing permissive intervention is their claim that their own resources, expertise and personal experience make them a much better advocate than the Attorney General to support the constitutionality of the statute. The fact that the applicants may be helpful in fully developing the case is a reasonable consideration in deciding on permissive intervention. *See Brennan,* 579 F.2d at 192.

However, the district court seemed to say that the resources of the state government were fully adequate. Although applicants point to the length of time it allegedly took the Attorney General to compile some data that the applicants say would be useful, the litigation has barely commenced. And, while the applicants say their counsel can draw on expertise from other funding litigation, the district court could conclude that this expertise may be effectively deployed through amicus briefs and by providing assistance to the state.

The applicants urge that their own personal experience in past campaigns would provide useful testimony to show why reforms are necessary. Conceivably, such testimony is not covered by the rubric of legislative facts. But there is no obvious reason why, if the evidence were useful and permitted by the district court, it would not be offered by the state, treating the applicants as friendly witnesses. The applicants have already been listed by the state as witnesses expected to testify.

■ A last factor, so far as permissive intervention is concerned, is that the district court made clear that it thought that the addition of still more parties would complicate a case that badly needed to be expedited. This is plainly a permissible consideration, *see* Fed.R.Civ.P. 24(b)(2), and while applicants say with some force that there would be no disruption or delay, this is the kind of judgment on which the district court's expertise and authority is at its zenith. *See Travelers Indem. Co. v. Dingwell,* 884 F.2d 629, 641 (1st Cir.1989).

■ In sum, on this record, the district court was not *required* to allow either intervention as of right or permissive intervention. All that remains is the possibility that the district court, in making its decision as to whether intervention as of right should be allowed, was misled by our language in *Moosehead.* The fact that the district court was not required to allow intervention does not mean that it was forbidden from doing so. On this record, it is unclear whether the district court would have decided the issue differently had it had the benefit of our clarification of *Moosehead* above.

Despite its nomenclature, intervention "as of right" usually turns on judgment calls and fact assessments that a reviewing court is unlikely to disturb except for clear mistakes. Indeed, while the four tests for intervention as of right are set forth as separate requirements, the courts recognize that there is some interplay between them. *See Patch,* 136 F.3d at 204 (endorsing a "holistic" approach). Thus, in practice, the district court enjoys a reasonable measure of latitude under Rule 24(a)(2) as well as Rule 24(b)(2).

The reality is that, as courts have moved from formalistic restrictions to a practical "interest" requirement for intervention as of right, so tests of "inadequacy" tend to vary depending on the strength of the interest. Courts might require very little "inadequacy" if the would-be intervenor's home were at stake and a great deal if the

interest were thin and widely shared.[3] The applicants in this case fall somewhere in the middle, and an appeals court would be unlikely under an abuse of discretion standard to reverse the district court, whether it granted intervention or denied it.

Accordingly, we *vacate* the order denying intervention and *remand* to allow the district court to reconsider whether its judgment is affected by our clarification of *Moosehead*. The court is free to entertain further submissions by the parties or to refuse them as it thinks best. The legal standard now having been made clear, the matter is confided to the sound discretion of the district court.

*It is so ordered.*

LYNCH, Circuit Judge, concurring.

I join in the decision vacating the order denying intervention and remanding to allow the district court to reconsider. I write separately on matters which the district court may wish to consider on remand.

Plaintiffs in this case include legislators and office seekers who oppose the Reform Act and seek to have it declared unconstitutional. Proposed intervenors are legislators and office seekers who favor the Reform Act and seek to have it declared constitutional. The personal stakes of the individuals in the two opposing groups are largely the same and are highly concrete. The interests of the proposed intervenors are sufficiently concrete to meet the requirements of Article III standing. The proposed intervenors are not simply a public-interest group with an interest best characterized as ideological. Whether the statute is constitutionally valid or not matters to each group of individuals and will determine in part how those individuals mount their election campaigns. The effect of the district court's order is that one group participates, but not the other. And the order does so in the face of a statement by the Attorney General of Maine, charged with defending the statute, that he would welcome the intervention. This no doubt reflects the Attorney General's correct recognition that his stake in the matter is similar to but not identical to the interests of the proposed intervenors.

It is a political reality that no state Attorney General is likely to say that the legal representation provided by his or her office is inadequate, or that the resources available to the Attorney General are sufficiently limited [4] as to place constraints on that office's ability to litigate complex cases. While the position of the Attorney General in favor of intervention cannot be dispositive, it is entitled to some weight in the Rule 24 equation. If the Attorney General felt that intervenors would burden the defense of the statute or prolong the litigation, he could easily say so. He has not done so here.

The Supreme Court has said that the burden of making a showing for purposes of Rule 24(a)(2) that the representation "may be inadequate . . . should be treated as minimal." *Trbovich v. United Mine Workers of America,* 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972) (internal quotation marks omitted). "[T]he language of the rule clearly suggests that now [the proposed intervenor] is

---

3. As Judge Friendly stated in *United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 983 (2d Cir.1984):

   [N]ot all "interests" are of equal rank, not all impairments are of the same degree, representation by existing parties may be more or less adequate, and there is no litmus paper test for timeliness. . . . A showing that a very strong interest exists may warrant intervention upon a lesser showing of impairment or inadequacy of representation. Similarly, where representation is clearly inadequate, a lesser interest may suffice as a basis for granting intervention."

4. In another context, that of altering pension schemes for public employees, the state of Maine has urged this court to recognize that it recently faced a state fiscal crisis. *See Parker v. Wakelin,* 123 F.3d 1, 3 (1st Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998).

to be allowed in, if the other conditions of the rule are satisfied, unless the court is persuaded that the representation of him is in fact adequate." 7C Wright, Miller & Kane, Federal Practice and Procedure Civil 2d § 1909, at 314–15. The panel opinion correctly notes that we have not directly ruled on the question of burdens after the proposed intervenor identifies some inadequacy. There is some tension in our case law. We have twice said that "the burden of persuasion that representation is adequate appears to rest on the party *opposing* intervention." *Caterino v. Barry*, 922 F.2d 37, 42 n. 4 (1st Cir.1990) (emphasis in original) (citing *Flynn* v. *Hubbard*, 782 F.2d 1084, 1090 n. 4 (1st Cir.1986)) (Coffin, J., concurring); *but see Public Serv. Co. v. Patch*, 136 F.3d 197, 207 (1st Cir.1998).

It is true that First Circuit precedent says that the government, in defending the constitutionality of the statute, is presumed to be adequately representing the interests of all citizens who support the statute. *See Patch*, 136 F.3d at 207. But that principle has limited application here, where the intervenors have concrete personal interests apart from generalized citizen support of the statute.

The constitutional issues involved in this case are significant and difficult. Those constitutional issues, unlike many First Amendment cases (involving, for example, facial attacks on statutes), may well depend heavily on the development of a factual record.[5] Any district court faced with such a case would be warranted in having concerns about judicial efficiency and keeping control of the litigation. But concerns that the case be decided on the basis of a fully developed factual record and briefing, or at least as full as the circumstances permit, may carry similar weight. It is precisely in fact-intensive cases that participation restricted to briefing of legal

issues in amicus briefs may prove to be least satisfactory. For this reason, as Judge Friendly recognized in *United States v. Hooker Chemicals and Plastics Corp.*, 749 F.2d 968 (2d Cir.1984), even where intervention is sought well after litigation had commenced (as is plainly not the case here), some courts have offered proposed intervenors "amicus-plus" status, or the right to call and cross-examine witnesses as well as to submit briefs. *Id.* at 991–93.

Constitutional challenges to campaign-finance laws pose exactly such fact-intensive questions. Though the standard is not fully defined (and I do not purport to do so here), the Supreme Court earlier said, for example, that regulation of certain political activity will not stand unless supported by concrete evidence of a systemic ill—usually, corruption or its appearance—that the challenged statute is designed to combat. *See generally Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *Federal Election Comm'n v. National Right To Work Comm.*, 459 U.S. 197, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982); Schultz, Proving Political Corruption: Documenting the Evidence Required to Sustain Campaign Finance Reform Laws, 18 Rev. Litig. 85 (1999). In hearing such challenges, courts take care to review a detailed factual record. *See, e.g., Buckley v. American Constitutional Law Found., Inc.*, —— U.S. ——, —— & n. 9, 119 S.Ct. 636, 641 & n. 9, 142 L.Ed.2d 599 (1999) (discussing factual record established at bench trial and by cross-motions for summary judgment); *California Prolife Council Political Action Comm. v. Scully*, 989 F.Supp. 1282, 1286 (E.D.Ca.1998) (partially resolving issues after two-week trial), *aff'd*, 164 F.3d 1189 (9th Cir.1999); *Buckley v. Valeo*, 519 F.2d 817, 818 (D.C.Cir.1975) (en banc) (per cu-

---

5. To give but one example, plaintiffs say, in furtherance of their theory of unconstitutionality, that although under the Act a "publicly financed candidate may not accept private contributions and must abide by spending limits ... these spending limits are in many cases illusory.... [Further,] the practical effect of the system is to coerce participation in the ... scheme." Brief for *Daggett* Plaintiffs-Appellees at 5.

riam) (remanding to district court with instructions to "[t]ake whatever may be necessary in the form of evidence—over and above submissions that may suitably be handled through judicial notice"); *Buckley,* 424 U.S. at 9–10, 96 S.Ct. 612 (noting district court's gathering of an augmented record on remand, including "extensive findings of fact"). The district court may consider whether the proposed intervenors offer evidence that is helpful to the court and unavailable from other parties. If so, appellants might be better intervenors than amici.

In deciding these matters, the district court may wish to consider the long history of allowances of intervention in similar cases. *See Buckley v. Valeo,* 519 F.2d 821, 834 (D.C.Cir.1975) (en banc) (per curiam) (discussing intervention by three organizations and eight individuals), *rev'd in part on other grounds,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *Vannatta v. Keisling,* 899 F.Supp. 488, 491 n. 2 (D.Or.1995) (intervention by two organizations), *aff'd,* 151 F.3d 1215 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 870, 142 L.Ed.2d 771 (1999); *California Prolife Council Political Action Committee v. Scully,* 989 F.Supp. 1282 (E.D.Cal.1997) (declining to reconsider prior intervention by initiative proponents in light of *Arizonans for Official English v. Arizona,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)).

Legislators and candidates, whose interests are directly implicated by campaign regulation, have often acted as intervenors. In one challenge to contribution limits, the district court granted summary judgment against plaintiffs challenging the law, and thus denied as moot a state legislator's motion to intervene. *Shrink Missouri Government PAC v. Adams,* 5 F.Supp.2d 734, 742–43 (E.D.Mo.), *rev'd on other grounds,* 161 F.3d 519 (8th Cir.1998), *cert. granted sub nom. Nixon v. Shrink Missouri Government PAC,* —— U.S. ——, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999). On appeal, the Eighth Circuit allowed the leg-islator to intervene. *See Shrink Mo. Gov't Political Action Comm. v. Adams,* No. 98–2351 (8th Cir. Aug. 3, 1998) (order permitting intervention). In a lawsuit challenging limits on spending by candidates for state judgeships, the court allowed intervention by judges and judicial candidates on both sides. *See Suster v. Marshall,* 149 F.3d 523, 526 (6th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 890, 142 L.Ed.2d 788 (1999). In a challenge to a city campaign-finance ordinance, the court allowed intervention by a once and future candidate for city council. *See Kruse v. City of Cincinnati,* No. C–1–96–252 (S.D. Ohio filed Oct. 21, 1996) (order granting intervention). In constitutional challenges to comprehensive state regulations of campaign finance similar to those at issue in this case, two courts allowed intervention by parties including legislators intending to run for re-election and unsuccessful candidates planning to seek office again. *See Vermont Right to Life Comm., Inc. v. Sorrell,* No. 2:97–286 (D.Vt. Jan. 5, 1998) (allowing, from the bench, intervention as of right or, in the alternative, permissive intervention); *Arkansas Right to Life State Political Action Comm. v. Butler,* No. 97–5064 (W.D.Ark. Sept. 30, 1997) (order granting permissive intervention). We have not found, and appellees did not submit, any decision denying, on the merits, intervention by candidates and legislators in a campaign-finance dispute.

As a leading commentator has noted, "[A] lawsuit often is not merely a private fight and will have implications on those not named as parties." Wright, Miller & Kane, *supra,* § 1901, at 228. That recognition is the conceptual underpinning for intervention under Rule 24(a). This lawsuit is a far cry from a private fight. The rationale for intervention may have particular force where the subject matter of the lawsuit is of great public interest, the intervenor has a real stake in the outcome and the intervention may well assist the court in its decision through the produc-

tion of relevant evidence and the framing of the issues.

But these are, in the first instance, matters for the district court. Because the district court may have been led astray by this court's language in *Moosehead Sanitary Dist. v. S.G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir.1979), I join in the order.